We have veterans at the table now, so I will dispense with my normal cautionary tales and just call the case Vasquez v. United States, Mr. Martin. And please the Court, my name is Scott Martin and I represent Lydia Vasquez in this appeal of the 140-month sentence that she received upon her conviction for enticement under Section 2422A of Title 18. This appeal concerns the meaning of the word minor under Guideline Section 2G1.3. The basis for Ms. Vasquez's conviction was her admission that she attempted to entice an adult male named Keith to travel from Michigan to Texas for the purpose of engaging in illegal sexual activity with her 12-year-old daughter. At sentencing, the District Court applied an eight-level enhancement under Guideline Section 2G1.3b5 on the ground that this offense also involved a minor who had not attained the age of 12 years. The basis for this enhancement was Ms. Vasquez's representation to Keith that she had a cousin who was pregnant and who was going to give her a child after its birth and that she and her newborn child in their anticipated sexual activities. But in applying this enhancement, the Court did not make any finding as to whether this unborn child was real rather than fictional, even though Ms. Vasquez at sentencing denied that it was real. Instead, the Court essentially pre-permitted... But did she really deny it? I mean, it's awfully hard to understand what she's saying. She's kind of rambling along and I agree that the District Judge kind of cuts her off here and there, but she doesn't affirmatively state, this kid wasn't real. She says, it's me, sort of says that, that's the closest. I mean, didn't you all have an obligation to present evidence that it really wasn't real that's more affirmative than, well, it's me, I was three years old, and the kind of rambling she was doing? Well, Your Honor, first of all, I don't think that her statements can be brushed off so as to say, this is a typical instance of sexual abuse and suffers from a variety of mental health disorders, and that's undisputed. And in her allocution, she did say, the baby, that's me, all of that, it's me, and she rejected the idea that... Right, and I'm not trying to take away from her difficult life story. That's not what I meant by rambling. I meant that her statements, whatever you want to call them, were not unequivocally, the baby that I discussed with Keith was not real or was just a manifestation of my mind reminiscing, you know, not reminiscing, but reflecting on my own difficult past. She didn't say that. I realize she's probably not as articulate as, you know, a lawyer or something like that, but still, don't we need some kind of evidence? Well, Your Honor, she did say it's all me, and also defense counsel did say that she made this up. There was no information in the PFSR stating affirmatively that she had ever admitted that this child was real. She had admitted... More fictitious. There was no inference in the PSR. There's no inference in the PSR, so basically there was no... Searching for the cousin, right? Right. There was... They were looking for the cousin. They could not identify the cousin, so basically there was a lack of any evidence, and then you had these statements by Ms. Vazquez at... I thought she told the FBI agent that it was her... No, Your Honor. She... The PSR says she admitted to having these discussions about an unborn child, which basically she admitted to the discussions... That was supposed to be her cousins. That was the story, was that she had some cousin who was going to give her a baby, and she admitted to the FBI that she had these discussions, but that's not the same as admitting that the child was, in fact, real. And Your Honor, our argument in this case is basically the court used the wrong legal framework for deciding this issue. It essentially pre-termited the question of whether this child was real or fictional. The court stated, quote... So if we were to agree with you that the question boils down to whether there was a real or fictitious child, then what would be the remedy? We've sent it back for resentencing where there's evidence put on about real versus fictitious. That's true, Your Honor. That's the remedy we would like. In Fulford, which is the 11th Circuit case that's cited in both of the briefs, the 11th Circuit was passing the same language, a definition of minor, as it applies to Guideline Section 2G2.2, and basically interpreted it the same way that we're suggesting, that the court in that case said where the defendant is not dealing with a law enforcement officer, the enhancement applies only where the minor is actually a true, real, live, sure enough minor. And in that case, the district court had not made that finding. The district court thought that intent was all that mattered. So the 11th Circuit disagreed and vacated the sentence and remanded to the district court to make a finding as to whether the government had shown by a preponderance of evidence that it was, in fact, a real minor. And Ms. Vasquez suggested that would be an appropriate remedy in this case, too, to remand for the district court to make a finding as to whether the government has met its burden in this case. But the district court said it didn't matter whether the child was real or not. So if it went back, would it have to go back with an instruction on the law? Yes, Your Honor. And that's what we're recommending here, is that you instruct the district court that the proper framework here is that contrary with what the district court had thought before, that the guidelines definition of minor does not include a child, whether born or in utero, who is the fictitious creation of someone who is not a law enforcement officer. And the basis, the reason why that's so is, first, let's look at what the guideline itself says. 2G1.3B5's eight-level enhancement applies when the offense involved a minor who had not attained the age of 12 years old. The guideline's definition of minor at Application Note 1 sets out just three ways, A, B, or C, that the unborn child in this case could possibly qualify as a minor. Now, the government and Ms. Vasquez agree that definitions B and C do not apply because those basically apply in sting operations where you have either a law enforcement officer who's created a fictitious minor for the purpose of the sting or where the officer is masquerading as a minor. Who has the burden of proof when there's always been this inference that the child was real until the lawyer argues at the sentencing that the child was fictitious? Who has the burden of proof to convince a district judge that the child is not real? Your Honor, the government always has the burden of proof. It's a defense at that point. At the sentencing, it's a defense. Yes, Your Honor, the government has a burden of proving that the guideline applies and has to prove it by a preponderance of the evidence. And in this case, there is not a preponderance of evidence that the child was, in fact, real rather than fictional. And this became an issue at sentencing in the government. The preponderance of the evidence at that point would be the child was real because there was never an indication the child was fictitious until the lawyer stood up at sentencing and said, oh, there is no real baby. Well, Your Honor, it wasn't just the lawyer. It was Ms. Vasquez as well who said it was all me and she made various statements. Go on over that. It's a little hazy.  And I agree, Your Honor. And that's why we feel that an appropriate remedy would be to remand for a finding and potentially more evidence on this on whether or not that there was, in fact, a real child here because we're talking about a very significant increase in her sentence based on this. It's a 69-month difference between the sentence she got and the top of what we contended. Well, I guess the exchange you're having raises a question for me. Is there a presumption, because we see a lot of these cases where the defendant, in response to the original claim of a crime, says we were role-playing, we were pretending to be, you know, in junior high again and that's why I was treating her as a 12-year-old because of this role-playing idea and I knew all along she was, you know, 30 years old or something like that or I thought she was 30 years old and we're really having this role-playing. So you get these kinds of arguments about thinking somebody's one age and then pretending they're another for some kind of, you know, fantasy thing or whatever. And so is there a presumption that when you have, and this is a difficult thing to call a fantasy, okay, because it's about as disgusting as it gets, but if you have somebody talking about offering a to-be-born baby for some kind of sexual event, is there a presumption that that baby's real? No, Your Honor. We don't take the position that it's a presumption at all. We feel it's the government's burden to show that, particularly in a case where the defendant has disputed that at sentencing. But Your Honor, with respect, I don't think we would get to that issue here because, again, the court essentially pre-terminated that issue and said that that's not the issue in this case. The court was addressing — Well, it addresses Judge Clement's question of burden of proof because, to me, burden of proof could be determinative here because it just didn't a whole lot of proof. And so if the burden was on the government to prove a real baby, I don't think they did that. If the burden was on the defendant to prove a fictitious baby, it's — hazy's a good word for it. I mean, you know, the defendant's attorney says that, and she — again, to be fair, I'm not — I understand that we take our defendants as we find them and they're not all perfectly articulate. You know, she's had a lot of problems in her life and so on and so forth, but it's a little hard to get your arms around what she's trying to say. And yes, the judge does tend to cut her off a lot. But still, it would seem like the attorney would have said, Ms. Vasquez, was it a real baby and gotten her to answer that rather than simply relying on the — you don't like the word rambling, but that's how it comes across to me. I understand, Your Honor. I think the attorney in this situation decided to let her speak for herself, and this was her way of conveying to the court that this was all — these were all allusions to her own sexual abuse as a child and that it was all me. And this — that's what the lawyer in this case decided to do. The — It's all me. She also stated that, oh, I never meant for him to have contact with my 12-year-old. I wanted him here for me, to have sex with me. So I can't attribute that explanation that it's all me to say that there was no unborn child. Well, she — Your Honor, in this case, she did actually refer to — she said, the baby, that's me, too. I was 3 years old, and I went next door to get candy and drinks because I knew that's where I could get them. So she was talking about this baby, that that was her. So — and again, on page 280 of the transcript, she says, all of that is me, and the reason I can be so detailed and graphic — and she goes on — because it's all me. I don't want a child. I can still have my own. So she's clearly disputing that this child was anything other than herself. And yes — She says, I don't want a child. That intimates that she doesn't want this cousin's child. A cousin was going to give the baby to her or to someone. I understand that's an alternate way you can look at it, but that's — we feel that's not what she was trying to convey here. And we think that the overall problem here is the fact that the court pre-terminated this question in the first place and didn't address it because the court said, quote, you can have a fictitious minor, and this is what this was, even if there was nobody that was going to give her a child. She was talking about, at the very, very least, a fictitious minor. That's what the court said. And so we feel that the court, in this case, used the wrong legal framework, as shown by the canons of statutory instruction, which we've discussed at length in our brief. And are you saying that sort of overrides everything else? Because when you've got the judge repeatedly saying, look, I don't want to hear about this fictitious versus real because that doesn't matter, then — granted, you maybe should make a proffer or something, but it kind of sets the path in a different direction. Yes, Your Honor. And we feel that remanding for a finding on that issue and for more evidence would be an appropriate remedy in this case. And so it could turn out that there's some evidence of a real baby, or the judge could disbelieve the now story, which, similar to my allusion to other cases, where all of a sudden, now the defendant's saying it was play acting when it seemed like it wasn't. You don't have to believe that story. So she could — She could make that determination herself based on the evidence that's presented on remand. Briefly, I'll address why this error was not harmless, as I said before. Without the eighth-level enhancement, the guidelines would have been 57 to 71 months. The 140-month sentence she got is 69 months higher than the top of the correct range of 57 to 71 months. The court did not say that it would have imposed the same sentence had it been aware of the error that we're discussing here today. And it's brief. The government has not made any attempt to show that the error was harmless. And with that, Your Honors, I'll save the rest of my time for rebuttal. Thank you. All right. Thank you, Mr. Martin. Mr. Kuhl. Good morning, and may it please the Court. Andrew Gould for the United States. The district court properly applied the under-12 enhancement under 2G1.3b5 because Ms. Vasquez's cross-state lines with the promise of sexual activity with an infant after that infant's birth. And under those circumstances — But his travel was before the expected birth. He traveled in August, and the baby was supposed to be born in January. That's correct, Your Honor, but keep in mind what the offense itself was. Under 2422a, that prohibits whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce to engage in prostitution or in any unlawful sexual activity. Well, but the daughter, the real daughter, H.S., is enough unlawful. Had he been traveling to have sex with a 12-year-old, that's unlawful enough without the whole baby thing. Correct. Correct, Judge Haynes. And that's why the prosecution was focused solely on H.S., not on the infant. But there hasn't been a question in this case that her relevant conduct for purposes of sentencing involved the unborn infant. And, again, the persuasion that occurred at the time to get Keith to cross, it was not just for sex with her 12-year-old daughter, but it was also a promise that in the future they can engage in depraved sexual acts with this infant after the infant was born. Again, the offer was not so that in August, while the baby was still in utero, that they were going to engage in this sexual activity. Let me ask you this. You're arguing, essentially, that the judge was right. It doesn't matter if it's fictitious or not. It's the intent of Keith and Mrs. Vasquez. Are you resting on that, or do you have arguments about if, in fact, a fictitious baby would not qualify, but a real baby would, do you have any arguments on that? Yes, Judge Haynes. In fact, that's our primary argument. Our primary argument is that there was, in fact, an infant, excuse me, an unborn infant at the time, and that's the reason that it qualifies. We have argued, alternatively, that it qualifies under the fictitious rationale, but our primary argument rests on the reality of the infant. And let me address two points related to that. First, regarding whether the district court, in counsel's words, pre-terminated any discussion about it, and second, the issue of the factual finding. I would encourage the court to look at the full sentencing colloquy when the district court overrules the objection, and you can find this at ROA 301 through 303. At the beginning of this objection, the district court identifies a critical issue, not as to whether a fictitious unborn child qualifies as a minor, but simply, does an unborn child qualify as a minor? And then the court goes on to say the talk was about, once a child is born, and obviously an infant would be a minor. At that point, counsel keeps objecting and says, but your honor, the baby wasn't born yet. And it's at that point that Judge Alvarez switches gears and says, well, at the very least, you can have a fictitious minor under the guidelines, and that the infant so qualifies. In there, there's two alternative rationales. At the beginning, the district court is assuming there is a real, actual unborn infant, and then it's afterward that the court says, well, even if it's fictitious, it so qualifies. So I'd encourage the court to keep that in mind when reviewing whether, as counsel says, the district court pre-permitted any discussion. Even, however, if this court were to rule that the district court solely applied the basis on the fictitious rationale, this court can affirm an enhancement for any reason supported by the record. And that gets into the factual finding point. Was there a factual finding that there, in fact, existed an infant? I want to be very clear that there was no clear objection at sentencing that there was no infant. It happened for the very, there were no written objections, and it happened at the very first time at sentencing. That's all right. Of course, counsel is free to make oral objections at sentencing, and they are entitled to equal weight as written objections. But here, the objection, excuse me, I don't even want to characterize it as that because it really wasn't an objection. It was just a statement by counsel that there was no infant for the first time. The district court, again, through its statements at ROA 301 and 302 was assuming there was an infant. And the pre-sentence report equally assumes that there actually was an infant. And I want to direct the court to two paragraphs in the pre-sentence report that bears this out in particular. First in paragraph 25, the probation officer recommends a two-level enhancement because the offense involved a minor who was the relative of the defendant. The probation officer said that this enhancement could be applied on two bases. First, the daughter, and second, the infant who would be the daughter of her cousin and therefore a relative. But, of course, if the infant was fictitious, then she couldn't be a relative. Later, in paragraph 78, the probation officer recommends an upward departure. And as part of the reasons given for the court's recommendation, it states that Ms. Vasquez could not know the harm that Keith would cause, not just to her daughter, but also to the infant. But, again, if there was no infant, then no harm obviously could result to the infant. So the pre-sentence report presumes that there is, in fact, an infant. The pre-sentence report also discusses Ms. Vasquez's post-arrest admissions to the FBI. At ROA 321, we see where she tells the FBI that there's a little girl that she was thinking about adopting in January. In paragraph 12 of the pre-sentence report, at 347, she says that there's a newborn that a cousin in Fort Worth planned to give away. I'm sorry, where was that at? ROA 347, paragraph 12 of the pre-sentence report. And at that same paragraph, she also recounts her depraved sexual plans that she shared with Keith. But she also adds this, that she would be gentler. But if the infant were fictitious, who would she have to be gentler with? Because, again, this is just simply her imagination. There's no denial at any point to the FBI that this was, in fact, a figment of her imagination. And permeating the pre-sentence report is this presumption that there is, in fact, an unborn infant. Ms. Vasquez points to paragraph 17 of the pre-sentence report, and there it's where it states that an FBI agent indicated that he was unable to locate the relatives of the unborn child. But that's all it says. And that may be true, that the FBI agent was unable to locate the relatives. But that's not a statement that the child did not, in fact, exist. It's just that they couldn't. I've lost track of when the January was. Is the January where the baby was supposed to be born before or after these statements? In other words, when these statements were made in the pre-sentence report, had the birth date already passed, or was it still looming? No, Your Honor. This would have occurred in August of 2014, about the time of the arrest. So she's contemporaneously stating to the FBI, according to the pre-sentence report, she's giving all indications that this infant will happen, that this will happen in January. All right. If it gets remanded for additional findings, are the FBI or the United States Marshals still looking for this cousin? Judge Clement, I'm not aware whether they're looking for it, but having spoken with the we would put on evidence that there—or we would, at that point, put on evidence that there, in fact, existed an unborn infant. I think there was a question— What would the evidence be? I'm sorry? What would the evidence be? Well, the evidence would be that she had a cousin who was actually pregnant at the time, and presumably, at this point, there would, in fact, be a lie. You found the cousin? Do you know the identity of the cousin? My—my understanding, of course, all—much of this is outside the record, but my understanding is that we—is that we were able to identify that there was a pregnant cousin. I can't state definitively if we knew exactly who that cousin was, but we had evidence at the time that—that there—that this offer that the cousin made, that she was planning on adopting a child, was real. And again, on— But they said at the sentencing hearing that they couldn't find the—the pregnant cousin. That's correct. And I don't know the context of—I don't know what searching went on for that cousin at the time. But wouldn't that be a reason to have a hearing? I mean, I'm sitting here and listening to you, and like, first you're saying there is a cousin, there isn't, we found her, we haven't found her. I mean, that's why you would have a hearing. If you all have evidence that there is a cousin who was pregnant around this time, due in—around January 2015, you know, that's going to be pretty good evidence to support this enhancement, and that's that. If not, and she gets up and is a little more coherent about how this was a fantasy and fiction and all of that, then the judge could believe that, and that would make the Eight-Level Enhancement go away. It seems to me you're really giving us a reason to have a hearing. Respectfully, Your Honor, I disagree. I think that it's important to look at what occurred at sentencing, and there was a discussion of the burden of proof. And again, throughout the pre-sentence report, it's presenting this infant as real. And at that point, there is no objection. There is no clear objection that this infant, in fact, is fictitious. Even if you're correct, which it takes a hard focus to follow, you know, sort of that whole train, what's the—given the gravity here and arguments made, I mean, what is the difficulty with a remand anyway? I mean, even if you're right, as you piece it together with us and so forth, I mean, it just seems with the size of the enhancement, it sure would be a lot better to have it clearer or clear or undeniable, and if the government has in its hands, you know, where's the downside? I mean, other than being right and getting it affirmed on appeal, but from the holistic government standpoint, if it's taken these nuanced arguments to get us to the point of whether it's real versus fictitious and the size of this enhancement, but my real point is, counsel opposite said there's no indication from the judge that notwithstanding, you know, the sentence would be the same, which as you well know, we often get ones where it just will not matter. But here, can you say from the record that it might not matter, that—about the sentence, so that we ought not just send it back? I'm not asking you to give up your position. I understand, Chief Judge Stewart, and the government's position is simply that Ms. Vasquez's self-serving assertion, and actually it was through counsel's statement at sentencing, was not enough to call into whether it was clearly erroneous that there in fact existed an infant. Had she clearly raised the objection before the district court? No, I mean, I get that, but this is not, at least for me, this is not a bread and butter we see this charge every day. In fact, I think this is the first time I've ever seen it in 22 years of being on this court. Maybe it happens, you know, with more frequency, but I've never had a case with this statute in this sort of, well, whatever, scenario. So it's just not as clear as I'd like it, I'll put it that way. Even assuming you're right, of just, you know, writing this thing, if this comes up, does this—are there a lot of prosecutions under this statute? I mean, under 2422 subsection B, not subsection A, and 2422B, because that's normally the law enforcement sting scenario where there's the use of a computer to entice somebody to, you know, cross state lines for unlawful sexual activity. You don't see many prosecutions under 2422A. And speaking candidly, as I—this is a very unique case. And as I was doing my research, I could not find any situation in which the—it was the defendant making the offer versus receiving the offer, because again— And even to your point, you know, if the only thing we had was, you know, was the objection clear enough, et cetera, that go off. But it just doesn't seem to my eyes that the district court was clearly honed in on, you know, what you're saying, maybe because it is sort of fictitious versus real, when's the baby going to be born, who's the cousin, you know, if Keith is real, where is he? There's a lot of moving parts here. So in just reading the colloquy, she cuts off the defendant, and as Judge Haines said, you know, we've got a defendant who's not— So I guess I sort of question the confidence the government ought to have in this enhancement, given the shaky scenario, as opposed to if you've got the cards and it goes back, you know, you still get the enhancement, but with a record that's just a little more solid. Like I said, I'm not urging you to abandon your position, but I appreciate your candor in terms of that this does not come up very often under the part of the statute that we're dealing with. Correct. And we're not going to abandon our argument respectfully. I understand the court's position, and it would have been clearer had there been a clear objection. Okay. Well, let me ask why this is not clear. R-301. Judge, in this case, there's no evidence at all that there was ever any minor under the age of 12 years old. You may recall—and this is the thing about the minor being unborn. It says, you may recall in the PSR report that Agent Hamilton tried to find out who the person was that was going to have the baby. He could not find anybody. They confessed it wasn't happening. Ms. Vasquez made this up. That seems to me to be a pretty clear claim. We have the overlay of whether the unborn baby can be a minor, and I realize that's a separate issue that I don't think is much of a starter here because there wasn't an offer of the baby in utero. The offer was of the baby once born. But there is a clear statement, Ms. Vasquez made this up, and then that's buttressed by her somewhat less than coherent statement about this is me and, you know, my—and we know that she did have at least a claim of a rather long history of sexual abuse as a child. So I don't understand why that's not a clear objection. Because, again, there were other portions of the pre-sentence report that rely on the presumption that there in fact existed. But, you know, the judge got it. I mean, even if we can say maybe I could make a clearer objection than this lawyer did, the judge kept talking about it doesn't matter if it's a real or fake baby or fictitious baby. Does not matter. She says this over and over again. She cuts everybody off over and over again. When Ms. Vasquez is trying to tell her story, she's like, look, I don't want to cut you off, but I'm going to cut you off. Tell me something in mitigation of your sentence. So she keeps saying, I don't care about this. And why isn't that enough to completely overwhelm any argument about the defendant should have put on more evidence or who's got the burden or whatever, when the judge is like, I don't want to hear it. I've made my decision. It's, you know, I was one of those lawyers who would get in front of the judge and say, well, I'm going to make my proffer anyway. But it's kind of hard to do. Judge Haynes, I think if you look at Ms. Vasquez's full colloquy from 302 to 310, there she had multiple opportunities to state that this was, that the infant was, it was fictitious. I mean, again, I have read the whole sentencing transcript. Not that long. I've read it. And as I said, I think she's rambling. And from my standpoint, as hopefully a reasonably articulate person, I could say it better. But we're, we're dealing with the defendant as they are. And this was her story that that's me. The baby is me. Yes. Yes. And no, I read the baby. That's me too. If that's all she had said and stopped there, I would agree with you that there could be ambiguity. But then she goes on to describe the horrific sexual abuse, which is not contested that she endured as a three-year-old. And we agree with Ms. Vasquez that she's alluding to her own sexual abuse that she encountered. But that's not a denial that there was an infant. It's basically, she was saying the ideas that she had for the infant, that came from the horrific sexual abuse that she endured. I don't read a fact-finding from a fact-finder that that's real. I mean, when you have an ambiguous statement, did she mean that's me, like that's why she wanted to abuse a real baby? Or that's me, that's why she made up a baby? Isn't that quintessentially the kind of thing that somebody on the ground looking at everybody and assessing their credibility, la, la, la, is the person to make that decision rather than three appellate judges, you know, a thousand miles away? I understand Judge Haynes, but the district court did adopt, generally, the pre-sentence report, which presumes. I would add, however, going back to Judge Clement's question to counsel, I do think that even were this court to remand, although the government doesn't think it's necessary, there would need to be an instruction on the wall. Because obviously, this could, the same objection could be raised about legally, would an unborn infant suffice? Do you agree with the opposing counsel that the case was decided within the wrong legal framework? No. The fact that she said it doesn't matter if it's fictitious or real, that that's error? We read it differently, Judge Clement. Again, we read it that there were two different bases for the district court statement. It starts by framing the issue as whether an unborn child without the fictitious, and then it moves on to the fictitious rationale. So we don't read it that way. Okay. Thank you. Thank you, Your Honors. Thank you, sir. Any rebuttal, Mr. Marn? Your Honors, from your questions to opposing counsel, I can tell you understand our position completely. I would like to point out a couple things. In Fulford, the Eleventh Circuit case that I discussed, the Court of Appeals did address the legal issue and then remanded for a finding on the question, which we think is the correct thing to do, especially in light of the government's suggestion that there may be other evidence that needs to be presented. That's news to us. I think that does further highlight why a remand for a finding is necessary in this case, especially given the 69-month disparity between . . . If we do send it back, would you please ask clear, coherent questions of this defendant, and please make the effort to have her be as coherent and clear as she can be on what she's saying, so that there's not any confusion? Yes, Your Honor. You have my promise. Is she in jail? Is she in custody right now? Yes, ma'am. Is she being treated for any mental condition? There was a recommendation for mental health treatment, and so they're taking those kinds of steps at BOP right now. So her mental state could be decidedly different from the mental state that was presented to the district judge at sentencing?       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. If she's not-       Are there any other comments or questions regarding the issues presented today and other conditions? Okay. Thank you, Your Honor. Thank you, Mr. Barnaby. We have your opinion. All right. Call up the next case, Republic Waste v. Texas Disposal.